**Morganti v. Morganti.**

242

*Jacquelyn R. Mark*, for plaintiff.
*Lisa D. Gentile*, for defendant.

BUCCI, *J.*, February 14, 2013—

## Findings of Fact

1. Plaintiffs Donna and Daniel Morganti, husband and wife (hereinafter referred to as "maternal grandparents") are the natural parents of defendant, and the paternal grandparents of the child who is the subject of this litigation: Christian Henry, born October 13, 2004 (hereinafter referred to as "the child").

2. Plaintiff, Vicki Brown, (hereinafter referred to as "paternal grandmother") is the mother of the child's deceased father.

3. Defendant, Danielle Wenger (formerly Danielle Morganti, hereinafter referred to as "mother"), is the natural mother of the child.

4. Mother is currently married to Eric Wenger (hereinafter known as "stepfather"), and they have been married since December 12, 2009.

5. The natural father of the child (hereinafter referred to as "father") is deceased.

6. Mother is a full-time, stay-at-home mother.

7. Mother has two other children from her present marriage, ages 4 years and 2 months, respectively, who

are the child's half-siblings.

8. The child is very close to his half-siblings.

9. The child is very close to mother and stepfather.

10. Mother has had primary custody of the child since August 5, 2011 by agreement of the parties. Said agreement was adopted as an order of court on that same day (the "August 5, 2011 custody order").

11. Maternal grandparents have two weekends of custody per month with the child per the August 5, 2011 custody order.

12. At times during the child's life, maternal grandparents have had primary custody of him, and during most of those time periods mother resided in their house.

13. The initial custody order in this case, dated February 15, 2007, gave maternal grandparents primary custody of the child. At that time, mother was residing with maternal grandparents. Mother was told by maternal grandparents that they would not deny custody of the child to her.

14. Maternal grandparents failed to properly care for the child when they had custody, for example they failed to obtain necessary immunizations, failed to provide dental care, and failed to dress him appropriately.

15. Mother repeatedly attempted to regain primary custody of the child from maternal grandparents, and she was promised that they would give her full custody in three to six months if she would drop the then-pending custody action, which mother did do prior to this current proceeding. However, maternal grandparents refused to give custody back to mother until the day of the pretrial

conference on August 5, 2011.

16. Four days later, on August 9, 2011, maternal grandparents filed a "petition to recant oral agreement" stating that their oral agreement on the record and under oath to give custody back to mother was not made voluntarily. The petition was denied. Maternal grandparents then filed an appeal to Superior Court, which was denied as well.

17. Maternal grandparents had filed a petition to modify during the pendency of the appeal which was held in abeyance pending the outcome of the appeal.

18. It is only as mother has gotten older and matured that she has been able to defend herself against maternal grandparents.

19. Maternal grandparents have historically controlled mother through fear and intimidation. Maternal grandparents have a toxic, harmful, estranged relationship with mother, which inures to the detriment of the child.

20. It is believed that maternal grandparents are currently subject to a Berks County Children and Youth Services ("BCCYS") investigation concerning issues with the child while in their care, and concerning reports of abuse against their own children (including mother) while their children were growing up.

21. Mother recently disclosed that she was sexually abused by paternal grandfather while growing up, and that she was physically and verbally abused by maternal grandmother.

22. Mother's brother Derrick Morganti also disclosed to BCCYS that he had been severely physically abused by

maternal grandparents while growing up.

23. Mother's sister Desiree also disclosed that she was sexually abused by paternal grandfather while growing up.

24. Mother kept a diary as a child, and in this diary she detailed one of the incidents of abuse against her brother.

25. The child reported taking baths with paternal grandfather and has made other comments that concern inappropriate behavior.

26. The child has informed mother that if he "tells pop-pop's (meaning maternal grandfather's) secret, then pop-pop is going to jail" and the child will never see him again.

27. Maternal grandparents have engaged a systemic campaign to alienate the child from mother, which justifies limiting contact between maternal grandparents and the child.

28. The child has reported that maternal grandparents have told him that mother is a "liar", that their home is his real home, that stepfather is "mean", that mother caused father to die, etc.

29. When they had primary custody, maternal grandparents failed to keep mother informed of medical and dental and educational appointments.

30. Maternal grandparents consistently try to interfere in the relationship between mother and the child, which justifies limiting maternal grandparents' partial custody.

31. Limiting maternal grandparents' partial custody is

in the child's best interests.

32. Maternal grandparents make custody exchanges difficult for the child. They have admitted to videotaping the exchanges over 20 times.

33. In the past year, paternal grandfather offered to buy the child from his mother for $10,000.

34. Maternal grandparents have told the child that he is not allowed to love his paternal grandmother.

35. The child and his mother have a very close and loving relationship.

36. The child has a very close and loving relationship with paternal grandmother and her family.

37. Mother and paternal grandmother cooperate and communicate regarding the child, and have a healthy relationship with each other.

38. The child has a very close and loving relationship with stepfather and his family, including stepfather's mother who testified as a character witness for mother.

39. When the child returns from visits with maternal grandparents, he has behavioral issues and repeats negative comments made to him by maternal grandparents about mother.

40. The child has made the comment that he can "smile" when he is with his mother at her house. The inference is that he does not smile while he is in the partial custody of maternal grandparents.

41. It is not in the best interests of the child to have any contact with maternal grandparents at this time according

to the child's counselor, Rana Dimmig, MSS, MLSP, LSW of A New Dawn Family Solutions, LLC.

42. Maternal grandparents actions justify limiting or even terminating maternal grandparents' partial custody rights.

43. Maternal grandparents' relationship with mother is harmful to the child's emotional development and is not in the child's best interest.

44. Maternal grandparents say they "love" the child, but have demonstrated over several years that the manner in which they express their love is unhealthy and detrimental to the child's best interests.

## DISCUSSION

This most recent custody trial is the latest chapter in the long saga of a very contentious child custody dispute between maternal grandparents and mother. Father is deceased.

Paternal grandmother and mother long ago have amicably resolved paternal grandmother's partial custody rights and have demonstrated that they are more than capable of cooperation and communicating with each other in a reasonable manner. On the other hand, mother and maternal grandparents have been locked in a contentious, vitorlic dispute for over six years. When the child was approximately two-and-a-half years old, maternal grandparents were granted primary custody of the child. At that time, mother was permitted to be at maternal grandparents' residence at all times and father was awarded periods of partial custody as agreed to between father and

maternal grandparents. In 2008 this order was modified, upon petition of maternal grandparents, to limit mother's access to maternal grandparents' residence. Maternal grandparents' filed a petition to modify and eventually a custody order was entered in 2009 wherein maternal grandparents retained primary physical custody of the child, but mother was granted partial custody Monday, Wednesday and Friday evenings, as well as every weekend from Saturday to Sunday, and Thursday evenings (if her work schedule changed to allow for that). Eventually, mother married, moved into her marital home, and sought primary custody of the child.

On March 14, 2011, mother filed a petition to modify the current custody order, seeking primary custody of the child. The custody master recommended that mother have primary custody and that maternal grandparents should have regular periods of partial custody. Maternal grandparents filed exceptions to the master's recommendation, which brought the case to this court's docket for the first time. We held a pretrial conference on August 5, 2011, at which time maternal grandparents and mother were each represented by counsel. Paternal grandmother was pro se. Following an off-the-record, in-chambers conference with counsel for the parties, (paternal grandmother did not participate as her rights of partial custody were not impacted), counsel consulted with their respective clients. After conferring with their clients, counsel informed the court that all parties had reached an amicable agreement. Counsel for the parties, in open court and in the presence of their clients, stated the agreement on the record and all parties, under oath, stated on the record that they agreed to the terms outlined by counsel. The agreement

provided that mother would have primary custody and maternal grandparents would have partial custody on alternating weekends. Paternal grandmother would have partial custody two weekends per year and two weeks in the summer. The court adopted the parties' agreement as an order of court (this is the August 5, 2011 custody order referred to above in the findings of fact).

Four days later, on August 9, 2011, maternal grandparents hired a new lawyer who filed a document entitled "petition to recant the oral agreement" essentially alleging that despite being competently represented in court and consenting to the agreement on the record, maternal grandparents were somehow forced into agreeing to the August 5, 2011 custody order. The court denied the petition without a hearing and maternal grandparents filed a pro se appeal to the Superior Court. Several days later, while the appeal was still pending, maternal grandparents' new counsel filed a petition to modify the agreed-upon order, which this court held in abeyance pending the outcome of the appeal[1].

On appeal, maternal grandparents alleged that this court improperly coerced them into agreeing to the terms placed on the record in open court. They alleged that this court "showed anger and resentment towards maternal grandparents." They alleged the court engaged in such scandalous behavior as "yelling and screaming" and stating "I don't care what the evidence will show...". Of course their allegations are not supported by the record and are refuted by mother's counsel who was present during all

---

1. The filing of the notice of appeal divested our jurisdiction during the pendency of appeal.

the proceedings, on and off the record. We likewise deny these preposterous allegations.

Maternal grandparents further alleged that they only agreed on the record to the terms outlined by counsel because they "panicked" when informed by their counsel of mother's allegations of sexual abuse against maternal grandfather.

We note that throughout these proceedings, maternal grandparents have been consumed by how this litigation is affecting them, rather than demonstrating to the court that they are concerned for the welfare of the child. To wit, their concise statement of matters complained of on appeal raises a myriad of issues, the overwhelming majority of which have nothing to do with the best interests of the child, but rather concern the perceived harm caused to maternal grandparents' reputation by mother's revelations about being abused as a child. We further note that because there was no hearing, there was no testimony regarding any such allegations. In fact, maternal grandparent's appeal and also their pending litigation in civil court against mother for defamation have done far more to draw attention to the allegations against them than anything in our courtroom on the day the agreement was entered. In their 2011 concise statement of matters complained of on appeal, maternal grandparents complain that this court abused its discretion by "not acknowledging the potential damage to the reputations and livelihoods of (maternal grandparents) if these allegations were left unaddressed"; in "not acknowledging that (maternal grandparents) are licensed therapeutic foster parents and these allegations, left unaddressed, could affect that position". They were also

concerned with their "right to confront their accuser".

Ultimately the Superior Court affirmed this court's ruling wherein we denied maternal grandparents' "petition to recant oral agreement" and remanded the case. Following remand, maternal grandparents moved forward with their petition to modify, which had been theretofore held in abeyance. The matter proceeded in due course to a conciliation conference with the custody master. Following the conference, the custody master (again) recommended that mother retain primary custody of the child.[2]

Maternal grandparents again filed exceptions to the master's recommendation. During the pendency of maternal grandparents' petition to modify, maternal grandparents filed a petition for contempt alleging that mother and paternal grandmother conspired to deny them their regularly-scheduled, partial custody weekend because paternal grandmother chose to exercise one of her two weeks of partial custody over summer vacation on what would normally be maternal grandparents' regular weekend. This court denied the contempt petition on the grounds that paternal grandmother followed the terms and provisions of the August 5, 2011 custody order, and in fact she went above and beyond the requirements by giving all parties advance notice of her choice of weeks and even deferred to all other parties' summer schedules before planning her vacation with the child. It is important to note that paternal grandmother is entitled to only two weekends

2. Following remand of record from Superior Court, maternal gran - parents were represented by the same counsel who filed the "petition to recant oral agreement". This attorney also filed the contempt petition and represented them at the contempt petition hearing and at the "sanctions" hearing.

*per year* and two weeks per year of partial custody of the child. Maternal grandparents, on the other hand, enjoy partial custody two weekends *per month*, and also extended vacation. With respect to maternal grandparents' complaint that paternal grandmother usurped one of their weekends of custody, we point out that paternal grandmother is entitled to two consecutive or non-consecutive weeks, which by its terms clearly anticipates that she could have custody over a weekend that would otherwise be maternal grandparents' (or a weekend period would otherswise be mother's). There is nothing in the order requiring paternal grandmother to defer to maternal grandparents' weekends. In fact, we believe paternal grandmother could have selected two, non-consecutive weeks of vacation, *both of which* could fall on weekends where the child would otherwise be with maternal grandparents, and she would still not have run afoul of the order by its terms. The order does not require paternal grandmother to notify maternal grandparents of her selected weeks of custody. Mother has sole legal custody of the child and there is no reason that mother cannot consent to whatever two weeks she feels is appropriate for the child to spend with paternal grandmother. To suggest that paternal grandmother was in contempt for exercising the meager custody time she enjoys, especially given her courteous and reasonable behavior in selecting her vacation time, is absurd.

Following a full hearing on maternal grandparents' petition for contempt, which required paternal grandmother to travel several hours in ill health to defend herself and mother to employ counsel to respond and attend the hearing, we found the petition to be baseless and frivolous and denied it accordingly.

Counsel for mother filed a "petition to impose sanctions" alleging that maternal grandparents' contempt petition was obdurate, vexatious and filed in bad faith entitling mother and paternal grandmother to attorney's fees and costs pursuant to 23 Pa.C.S.A.§5339.

On the 20th day of November, 2012, this court held a hearing to address the petition for sanctions. Following the hearing, we found that maternal grandparents' contempt petition was indeed obdurate, vexatious and filed in bad faith and we awarded mother $1,300 in counsel fees incurred in defending the contempt petition and we awarded paternal grandmother $438 to compensate her for her travel expenses incurred as a result of the filing of the contempt petition.

In response, maternal grandparents filed a petition for reconsideration on November 26, 2012, based on the fact that the court had not considered maternal grandparent's ability to pay the contempt sanction. We held an evidentiary hearing on the 27th day of December, 2012 to consider the merits of this petition. At this hearing, maternal grandparents presented little evidence to support their position, but rather attempted to re-litigate the underlying contempt issue by insisting that their reading of the August 5, 2011 custody order was reasonable and that therefore their contempt petition was also reasonable. The only evidence presented at the hearing regarding the parties' finances indicated that they have spent tens of thousands of dollars on legal fees[3] and other services, such

3. Father testified that he paid over $20,000 in legal fees in 2012 alone. During the pendency of the maternal grandparents petition to modify, maternal grandparents filed a defamation suit against mother which is pending before another judge of this court.

as privately-administered lie-detector tests, psychological examinations, court costs and the like, all as part of their ongoing crusade against mother. Following the hearing, the petition for reconsideration was denied.

Maternal grandparents' litigious behavior is appalling and causes us genuine concern over its traumatic impact on mother (and by extension, the child). No mother or child should be forced to endure such conduct and behavior as demonstrated by maternal grandparents. It is indicative of their priorities that maternal grandparents filed their contempt petition very shortly before mother gave birth to her youngest child. They demonstrated a callous disregard for the impact of the stress that being dragged into court would have on the health of mother (who is, after all, their own daughter) and also the impact on their unborn grandchild. Maternal grandparents have expressed no remorse for their actions nor do they even seem to grasp the harm that their course of conduct has had on mother and the child.

Maternal grandparents fail to understand or appreciate that it is healthy and natural for mother to have primary custody of the child. Rather than celebrating the fact that mother has grown and matured into a competent and capable parent, grandparents persist in their steadfast belief that the child should still be with them. We recognize that at one point in time, maternal grandparents had primary custody of the child and that they may have a strong (if not healthy) bond with him. However, maternal grandparents have not demonstrated to this court why, now that mother is mature, stable and prepared to care for the child, the child should be removed from her care.

## LEGAL ANALYSIS

The law favors the parents of a child above all others, and Pennsylvania has codified this presumption in the child custody act. See 23 Pa.C.S.A §5301 et. Seq.

> In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of a parent may be rebutted by clear and convincing evidence.

23 Pa.C.S.A §5327. In other words, the parties before us do not start off on equal footing, but rather maternal grandparents must overcome the statutory preference for the child to remain with mother. We find that the maternal grandparents have not overcome this presumption, and we make this finding based on an analysis of the standard custody factors, as set forth below, as well as the fact that maternal grandparents have failed to demonstrate mother's lack of fitness as a parent, raised any concerns about the safety, welfare, or development of the child while in her care, or provided any other relevant basis for setting aside the statutory presumption.

Notwithstanding the fact that this case involves a parent versus nonparents, "[i]t is axiomatic that the paramount concern in any child custody proceeding is the best interests of the child." *Costello v. Costello*, 446 Pa.Super. 371, 375, 666 A.2d 1096, 1098 (1995) (emphasis added). "Such a determination, made on a case-by-case basis, must be premised upon consideration of all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-

being." *Alfred v. Braxton*, 442 Pa.Super. 381, 385, 659 A.2d 1040, 1042 (1995)(internal quotations omitted). Because this is a case between mother and maternal grandparents, in addition to considering whether maternal grandparents have overcome the statutory presumption in favor of mother and considering the child's best interests, it may also be necessary to consider whether awarding maternal grandparents custody interferes with the child's relationship with mother. See 23 Pa.C.S.A. §5328(c)[4].

Keeping in mind the overarching issue of the child's best interests, and considering the presumption in favor of mother, we now consider the statutory factors set forth in the Pennsylvania child custody act. 23 Pa. C.S.A. §5328(a).

## Section 5328 Factors

1. In determining custody, we must evaluate which party is more likely to encourage and permit frequent and continuing contact between the child and the other party. 23 Pa.C.S.A. §5328(a)(1). There is extensive history in the case of maternal grandparents limiting contact between paternal grandmother and the child. For example, maternal grandparents would only allow paternal grandmother to see the child during mother's periods of custody. To this end, maternal grandparents filed a contempt petition against mother and paternal grandmother, which was (as discussed above) clearly frivolous. Also, maternal grandparents have at times attempted to limit mother's time with the child by refusing to surrender the child for mother's periods of

---

4. Standing was not challenged or addressed by this court, and ther - fore the basis of maternal grandparents' standing as it relates to Section 5324 vs. Section 5325 is not in the record. Accordingly, we do not.

partial custody and otherwise undermining and thwarting mother's attempts to have a relationship with the child. In sum, maternal grandparents have a dismal history when it comes to encouraging and permitting contact between the child and the other parties.

2. We must also consider any present and past abuse committed by a party, or member of the party's household, whether there is a continued risk of harm to the child or an abused party, and which party can better provide adequate physical safeguards and supervision of the child. 23 Pa.C.S.A. §5328(a)(2). The child's counselor, Rana Dimmig, testified extensively at the custody trial. Ms. Demmig has a B.A. in social work and a double master's in social work and law and social policy from Bryn Mawr College. She is a licensed social worker and has 17 years of experience working with children who have been traumatized, either physically, sexually, or emotionally. She was qualified as an expert at the custody trial and was permitted to testify as to her expert opinions.

Ms. Demmig testified that, based on conversations she has had with the child in the course of counseling, she suspects that the child has been exposed to unhealthy and inappropriate behavior at maternal grandparents' residence, including inappropriate sexual behavior. She testified that the child revealed to her that "pop pop had touched his penis and that it hurt". Ms. Demmig did not want to delve too deeply into the subject, because she did not want to taint any ongoing investigations into the allegations against maternal grandfather, and so she did not inquire further at that time. Additionally, there was testimony that maternal grandfather was bathing with the

child as recently as 2010. The child has also repeatedly told the counselor that maternal grandfather has a secret, and that if the child reveals the secret, maternal grandfather will either go to jail or die. Obviously this is vague and not clear evidence of sexual abuse, and, although the facts presented are disturbing, this case does not turn on the issue of sexual abuse of the child.

3. We next examine the parental duties performed by each party on behalf of the child. 23 Pa.C.S.A. §5328(a)(3). The child resides with mother and in mother's household. Mother performs essentially all of the parental duties, and the court is satisfied that she is performing them adequately. Paternal grandmother testified that mother is an excellent mother to the child. In addition to the day-to-day care of the child, Ms. Dimmig testified that "mom is doing a great job, implementing my suggestions". In sum, mother is adequately caring for the child and performing her parental duties.

4. The court must also consider the need for stability and continuity in the child's education, family life and community life, 23 Pa.C.S.A. §5328(a)(4). Obviously allowing the child to remain in mother's household, where he is now established and bonded with the members of that household, would promote stability and continuity. Paternal grandmother described stepfather as "a very positive influence in the child's life and excellent role model." Stepfather fills the role of a father figure in the child's life. Stepfather impressed this court as a responsible adult, genuinely concerned with the child's well-being. He appears to be a strong family man and a good stepfather to the child. Rana Dimmig characterized the child's healthy,

supportive relationship with his stepfather as a positive aspect of the child's life. The child has indicated that he would like to have stepfather's last name, but the child is conflicted about that because he also misses father. The child wants to be part of both father's and stepfather's family.

5. If this were a contest between two parents, the court would consider the relative availability of extended family. 23 Pa.C.S.A. §5328(a)(5). Because this is a contest *between* the members of the same family, this factor is not relevant or dispositive.

6. We next turn to the child's sibling relationships. 23 Pa.C.S.A. §5328(a)(6). This is a very important consideration in this case, because the child enjoys a close bond with his four-year-old half-brother, Jordan who resides in mother's household. We also note that mother and stepfather recently welcomed another child into their family, and if the child remains with mother, the child would have the opportunity to grow up with both of his younger half-siblings.

7. When appropriate, the court will hear the well-reasoned preference of the child, based on the child's maturity and judgment. 23 Pa.C.S.A. §5328(a)(7). The court did not hear, nor would it have considered, the preference of the child in this case, due to this child's tender age.

8. In reaching our decision, we evaluate any attempts of one party to turn the child against the other. 23 Pa.C.S.A. §5328(a)(8). This factor is one of the most significant factors here, given the degree and extent of acrimony

between maternal grandparents and mother. It is clear from the history of this case that the parties are at odds, with maternal grandparents going as far as suing mother in civil court. Rana Dimmig testified that maternal grandparents are engaging in campaign of parental alienation. She testified that:

It has been an absolute nightmare for Christian. He is consistently told that the person that he loves (mother) is not a good person and is not someone that he should be with, despite the fact that (paternal grandmother) also supports (mother) and that (stepfather) supports (mother)...He clearly wants to be with his mom and clearly he loves her, but he also clearly also doesn't want to disappoint (maternal grandparents). So that's the conflict for him.

Ms. Demmig further testified that the child told her that maternal grandmother calls mother a liar and tells him that he should not believe what she says. Maternal grandparents also apparently have told the child that they do not have to listen to mother or respect her authority, which is particularly damaging in this case where mother is attempting to re-establish a bond with the child. There was also testimony that maternal grandmother told the child that it is mother's fault that father died. Additionally, stepfather testified to witnessing maternal grandparents' belligerent conduct, such as maternal grandfather yelling and screaming at mother and maternal grandfather videotaping custody exchanges. The parental alienation by maternal grandparents is so pervasive that, based almost solely on this factor, Rena Dimmig has indicated to the court that she feels continued contact between the child

and maternal grandparents is contrary to the child's best interests. She testified:

At this point, (the child) needs to be in one stable, loving environment that is supportive of him. At this point, I truly believe that because (maternal grandparents) are not supportive of (mother) and her relationship with (the child) it causes too much conflict and emotional stress for him.

Really, at this point I don't recommend him to see them in an unsupervised or even in any setting right now until (the child) is able to firmly re-establish his relationship with (mother) so he doesn't feel so torn about wanting to love her and wanting to be with her.

The ongoing conflict between the parties is the crux of this case, and, clearly it favors awarding primary custody to mother and limiting or even eliminating all contact with maternal grandparents, at least until they are able to foster a healthy relationship between mother and the child.

9. We must determine which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child, adequate for the child's emotional needs. 23 Pa. C.S.A. §5228(a)(9). According to Rana Dimmig, who has observed the child's behavior and interactions, mother has a strong bond with the child and mother is focused on the health and well-being of the child. Likewise, paternal grandmother testified that mother and the child have a healthy relationship. There are no allegations that either party is unable to meet the physical needs of the child, however, maternal grandparents appear to be incapable of meeting the child's emotional needs,

based on their actions over the past several years as they relate to the child.

10. We must consider which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child. §23 Pa.C.S.A. §5328(a)(10). We are satisfied that mother is competent to care for the daily needs of the child. Ms. Demmig says mother is taking appropriate actions to address the child's stress and conflict. Mother follows the counselor's recommendation regarding parenting skills, such as setting boundaries for the child and developing a system of discipline based on rewards rather than punishment. On the other hand, maternal grandmother refused to take the child for immunizations during the period of time when maternal grandparents were the child's primary caretakers. With respect to the emotional needs of the child, we have grave concerns about maternal grandparents' capacity to adequately address them.

11. The court, where relevant, must also consider the proximity of the residences of the parties. 23 Pa.C.S.A. §5328(a)(11). This factor relates to the feasibility of custody exchanges, and therefore is not a particularly relevant consideration here. The physical distance between these parties is not the issue in this case.

12. The court must also look at each party's availability to care for the child or ability to make appropriate child-care arrangements. 23 Pa.C.S.A. §5328(a)(12). Mother is a full- time, stay-at-home mom who is completely available to dedicate herself to caring for her children, including the child who is the subject of this litigation. Maternal grandfather does not work because he is legally disabled

and maternal grandmother is also available for childcare. Therefore, this factor does not favor either party.

13. We must also review the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. 23 Pa.C.S.A. §5328(a)(13). As discussed more fully above in paragraph 8, there is an incredible degree of conflict between these parties, which is harmful to the child. The counselor testified that this conflict has spilled over into all areas of the child's life, affecting his behavior in general. The conflict is so extreme that maternal grandparents have gone so far as to videotape custody exchanges and to pursue civil litigation against mother for issues raised during the course of the custody litigation. The ongoing conflict to which the child has been exposed may cause long term emotional harm to the child. Rana Dimmig testified that the child's exposure to conflict is already manifesting in symptoms of post traumatic stress syndrome. We attribute the lions' share of responsibility for the conflict between the parties to maternal grandparents.

14. We must take into account any history of drug or alcohol abuse of a party or member of a party's household. 23 Pa.C.S.A. §5328(a)(14). Although there are allegations of mother's use of drugs in her youth, we have no evidence of recent or current use of drugs by mother. A parent's ability to care for a child must be determined as of the time of the trial, and not based on past behavior at an earlier point in time. *Hall v. Mason*, 462 A2d 843 (Pa. Super. 1983); *Bresnock v. Bresnock*, 500 A.2d 91 (Pa. Super. 1985).

15. We next look to the mental condition of the parties.

See 23 Pa.C.S.A. §5328(a)(15). We do not have a great deal of information about the mental health of the parties because evaluations were not performed. However, has a history of depression for which she was first treated at 21 years of age. This treatment included being hospitalized for seven days. Mother is currently prescribed Zoloft for post-partum depression. We are satisfied that any mental health concerns involving mother have been addressed and adequately treated, and thus we have no present concerns about mother's mental condition.

16. There are no other relevant factors that we have not already considered in determining the issue of primary custody of the child. See 23 Pa.C.S.A. §5328(a)(16).

## CONCLUSION

Because of the degree of conflict between the parties, the child's counselor Rana Dimmig testified that in her professional opinion, it is in the child's best interests to terminate maternal grandparent's partial custody at this time, even though maternal grandparents have been an integral part of his life since birth. She recommends insulating the child from maternal grandparents because they have created a "negative situation for the child" by attempting at each juncture to undermine mother's authority and disrupt mother's attempts to re-establish a healthy and nurturing relationship with the child.

Clearly mother is capable of having healthy relationships, as evidenced by her marriage and mother's relationship with paternal grandmother, which is in stark contrast with her relationship with her own parents. Paternal grandmother testified that mother is very supportive of her

relationship with the child, paternal grandmother supports mother retaining primary custody, whereas she is very critical of maternal grandparents. Paternal grandmother testified that "I know the best place for my grandson is with mother. He is safe there, happy there and thriving in mother's household".

In reaching a decision in this case, we consider the statutory presumption in favor of mother, the statutory factors set forth in evaluating the best interests of the child, the recommendation of the child's counselor as well as the fact that the child has a long-standing bond with maternal grandparents. Based on all of the foregoing, we enter the following order:

## FINAL CUSTODY ORDER

And now, this day of , 2013, after trial in this matter, it is hereby ordered and decreed as follows:

1. Mother shall have sole legal and primary physical custody of the child, Christian Henry, born October 13, 2004.

2. Maternal grandparents shall have partial custody of the child one Sunday per month from 12:00 noon until 5:00 p.m. As the sole legal custodian, mother shall have discretion to select which weekend maternal grandparents exercise this period of partial custody.

3. Maternal grandparents shall provide all transportation to and from mother's residence.

4. Maternal grandparents are prohibited from videotaping the custody exchanges and shall refrain from making any disparaging or negative comments

about mother or members of mother's household to the child.

5. Paternal grandmother shall have periods of visitation with Christian, for not less than four weekends per year and two consecutive or non-consecutive weeks each year. Paternal grandmother shall make arrangements directly with mother to schedule any of her periods of visitation. Paternal grandmother's periods of visitation shall take priority over the regular custody schedule.